UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDSEY C. F.,[1] | Case No. 2:25-cv-04721-JC |
| Plaintiff, | |
| v. | MEMORANDUM OPINION |
| FRANK BISIGNANO, Commissioner of Social Security Administration, | |
| Defendant. | |

## I.      SUMMARY

On May 23, 2025, Plaintiff Lindsey C. F. filed a Complaint seeking review of the Commissioner of Social Security's denial of Plaintiff's application for benefits.  The parties have consented to proceed before the undersigned United States Magistrate Judge.

This matter is before the Court on the parties' cross-briefs (respectively, "Plaintiff's Brief," "Defendant's Brief," and "Plaintiff's Reply") which the Court

---

[1] Plaintiff's name is partially redacted to protect plaintiff's privacy in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States.

1

has taken under submission without oral argument. See June 2, 2025 Case Management Order ¶ 4.

Based on the record as a whole and the applicable law, the decision of the Commissioner is AFFIRMED.  The findings of the Administrative Law Judge ("ALJ") are supported by substantial evidence and are free from material error.

## II.   BACKGROUND AND SUMMARY OF ADMINISTRATIVE DECISION

On April 28, 2022, Plaintiff filed an application for Disability Insurance Benefits alleging disability beginning on January 1, 2020, due to degenerative disc disease, neuropathy, arthritis, depression, chronic pain, and carpal tunnel syndrome. (Administrative Record ("AR") 41, 178-79, 244).  The Administration denied her claim on initial and reconsideration review, finding Plaintiff's mental impairments were "non severe," and that she would be capable of a range of light work consistent with the consultative examiners' opinions.  (AR 61-96; see also AR 432-37, 440-43 (consultative examiners' opinions)).

An ALJ then examined the medical record and, on April 17, 2024, heard testimony from Plaintiff and a vocational expert.  (AR 35-60).  On May 30, 2024, the ALJ found Plaintiff was not disabled since the alleged onset date.  (AR 17-30).  The ALJ found:  (1) Plaintiff had not engaged in substantial gainful activity since the alleged onset date (AR 19); (2) Plaintiff suffered from the following severe impairments: cervical and lumbar spine degenerative disc disease, bilateral knee osteoarthritis, bilateral carpal tunnel syndrome, and depressive disorder (AR 19-20); (3) Plaintiff's impairments, considered individually or in combination, did not meet or medically equal a listed impairment (AR 20-21); (4) Plaintiff retained a residual functional capacity ("RFC")[2] to perform light work (20 C.F.R.

---

[2]A RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  See 20 C.F.R. § 404.1545(a)(1).

§ 404.1567(b)) with additional limitations[3] (AR 21-28 (finding letter from treating Dr. Jessica Randell suggesting that Plaintiff would have difficulty completing simple tasks "not persuasive," and adopting a RFC consistent with, or more restrictive, than the remaining medical opinions)); (5) Plaintiff could not perform her past relevant work but she could perform other jobs existing in significant numbers in the national economy (AR 28-30 (adopting vocational expert testimony at AR 56-58)); and (6) Plaintiff's statements regarding the intensity, persistence, and limiting effects of subjective symptoms were not entirely consistent with the evidence (AR 22-28).

On April 11, 2025, the Appeals Council denied Plaintiff's application for review. (AR 1-3).

## III.   APPLICABLE LEGAL STANDARDS

### A.   Administrative Evaluation of Disability Claims

To qualify for disability benefits, a claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012) (quoting 42 U.S.C. § 423(d)(1)(A)) (internal quotation marks omitted), superseded by regulation on other grounds as stated in Sisk v. Saul, 820 Fed. App'x 604, 606 (9th Cir. 2020); 20 C.F.R. §§ 404.1505(a), 416.905(a).  To be considered disabled, a claimant must have an impairment of such severity that he/she is incapable of performing work the claimant previously performed ("past relevant work") as well

---

[3]Specifically, the ALJ limited Plaintiff to: (1) occasional climbing, balancing, stooping, kneeling, crouching, and crawling; (2) frequent reaching overhead, pushing, pulling, handling, and fingering with the bilateral upper extremities; (3) following simple instructions and completing simple tasks in a routine work environment; and (4) performing low stress work (i.e., work involving only occasional simple decision making and occasional changes in the work setting).  (AR 21-22).

as any other "work which exists in the national economy." Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)).

To assess whether a claimant is disabled, an ALJ is required to use the five-step sequential evaluation process set forth in Social Security regulations. See Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1052 (9th Cir. 2006) (describing five-step sequential evaluation process) (citing 20 C.F.R. §§ 404.1520, 416.920). The claimant has the burden of proof at steps one through four – i.e., determination of whether the claimant was engaging in substantial gainful activity (step 1), has a sufficiently severe impairment (step 2), has an impairment or combination of impairments that meets or medically equals one of the conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings") (step 3), and retains the residual functional capacity to perform past relevant work (step 4). Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (citation omitted). The Commissioner has the burden of proof at step five – i.e., establishing that the claimant could perform other work in the national economy. Id.

**B.     Federal Court Review of Social Security Disability Decisions**

A federal court may set aside a denial of benefits only when the Commissioner's "final decision" was "based on legal error or not supported by substantial evidence in the record." 42 U.S.C. § 405(g); Trevizo v. Berryhill, 871 F.3d 664, 674 (9th Cir. 2017) (citation and quotation marks omitted). The standard of review in disability cases is "highly deferential." Rounds v. Comm'r of Soc. Sec. Admin., 807 F.3d 996, 1002 (9th Cir. 2015) (citation and quotation marks omitted). Thus, an ALJ's decision must be upheld if the evidence could reasonably support either affirming or reversing the decision. Trevizo, 871 F.3d at 674-75 (citations omitted). Even when an ALJ's decision contains error, it must be affirmed if the error was harmless. See Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090, 1099 (9th Cir. 2014) (ALJ error harmless if

(1) inconsequential to the ultimate nondisability determination; or (2) ALJ's path may reasonably be discerned despite the error) (citation and quotation marks omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Trevizo, 871 F.3d at 674 (defining "substantial evidence" as "more than a mere scintilla, but less than a preponderance") (citation and quotation marks omitted). When determining whether substantial evidence supports an ALJ's finding, a court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion[.]" Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014) (citation and quotation marks omitted).

Federal courts review only the reasoning the ALJ provided, and may not affirm the ALJ's decision "on a ground upon which [the ALJ] did not rely." Trevizo, 871 F.3d at 675 (citations omitted). Hence, while an ALJ's decision need not be drafted with "ideal clarity," it must, at a minimum, set forth the ALJ's reasoning "in a way that allows for meaningful review." Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015) (citing Treichler, 775 F.3d at 1099).

A reviewing court may not conclude that an error was harmless based on independent findings gleaned from the administrative record. Brown-Hunter, 806 F.3d at 492 (citations omitted). When a reviewing court cannot confidently conclude that an error was harmless, a remand for additional investigation or explanation is generally appropriate. See Marsh v. Colvin, 792 F.3d 1170, 1173 (9th Cir. 2015) (citations omitted).

**IV.   DISCUSSION**

Plaintiff contends that the ALJ erred in evaluating Dr. Randell's opinion and Plaintiff's subjective statements and testimony suggesting greater limitations than the ALJ found to exist. (Plaintiff's Brief at 4-20; Plaintiff's Reply at 2-7).

5

For the reasons explained below, Plaintiff has not shown that reversal or remand is warranted.

> ### A.   The ALJ Properly Considered the Medical Opinion Evidence Including Dr. Randell's Opinion; Substantial Evidence Supports the ALJ's Non-Disability Finding

For claims filed after March 27, 2017 (such as Plaintiff's claim), new regulations govern the evaluation of medical opinion evidence.  Under these regulations, ALJs no longer "weigh" medical opinions; rather, ALJs determine which opinions are the most "persuasive" by focusing on several factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including the length of treatment, frequency of examinations, purpose of treatment, extent of treatment, and whether the medical source examined the claimant); (4) the medical source's specialty; and (5) "other" factors.  See 20 C.F.R. § 404.1520c(c)(1)-(5).

The two most important factors in determining the persuasiveness of medical opinions are supportability and consistency with the evidence.  See 20 C.F.R. § 404.1520c(a).  ALJs must explain how they considered the factors of supportability and consistency, but need not explain how they considered any other factor.  See 20 C.F.R. § 404.1520c(b).

> Supportability means the extent to which a medical source supports the medical opinion by explaining the "relevant. . . objective medical evidence."  Consistency means the extent to which a medical opinion is "consistent. . . with the evidence from other medical sources and nonmedical sources in the claim."

Woods v. Kijakazi, 32 F.4th 785, 791-92 (9th Cir. 2022) (quoting 20 C.F.R.

///

///

///

///

6

§ 404.1520c(c)(1), (2)).  "[U]nder the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence."  Id. at 792.[4]

### 1.    Summary of the Relevant Medical Record

Although Plaintiff reported she suffered from depression in her May 2022 Disability Report form (AR 244), there are no mental health treatment notes in the record before December 2022.  The first related record is from consultative examiner Dr. Lou Ellen Sherrill who provided a psychological evaluation dated July 19, 2022.  (AR 432-37).   Plaintiff complained primarily of physical problems, and reported that she was unable to work because she could not stand or walk for more than 15 minutes at a time without having to take a sit-down break, and she could not sit for long periods of time.  (AR 433).  She was not receiving any mental health treatment of any kind but was trying to find a provider.  (AR 433).  She reportedly maintained excellent relationships with her family, friends, acquaintances, and neighbors.  (AR 434).  She was able to perform household chores, run errands, go shopping alone, and perform all self-care activities independently.  (AR 433).  Her preferred activities were going to the store, going for short walks, and playing cell phone games.  (AR 434).

On mental status examination, Plaintiff was very friendly, polite, spoke clearly using complex sentences, was able to understand test instructions and interview questions without difficulty, had a normal mood and affect, and otherwise had findings within normal limits.  (AR 435).  Her full scale IQ score

---

[4]The new regulations also eliminated the term "treating source," as well as the rule previously known as the treating source rule or treating physician rule, which formerly required special deference to the opinions of treating sources.  See 20 C.F.R. § 404.1520c; Woods, 32 F.4th at 792 ("The revised social security regulations are clearly irreconcilable with our caselaw according special deference to the opinions of treating and examining physicians on account of their relationship with the claimant.");  see also Cross v. O'Malley, 89 F.4th 1211, 1213-14 (9th Cir. 2024) (discussing new regulations).

was 95, or average, and her memory scale testing was also average. (AR 435-36). Dr. Sherrill diagnosed persistent depressive disorder secondary to Plaintiff's medical problems, pain disorder secondary to medical problems, and occupational problems. (AR 436). Dr. Sherrill opined that Plaintiff could perform simple and repetitive tasks with minimal supervision with appropriate persistence and pace over a normal work cycle, could understand, remember, and carry out at least simple to moderately complex verbal instructions without difficulty, could tolerate ordinary work pressures, interact satisfactorily with others in the workplace including the general public, and could observe basic work and safety standards in the workplace without difficulty. (AR 436-37).

State agency physicians reviewed the record (which included Dr. Sherrill's opinion) in August 2022 and February 2023, and found Plaintiff's mental impairments were "non severe," in that they would cause at most mild limitations in Plaintiff's ability to concentrate, persist, or maintain pace, and no limitations in other areas of functioning. (AR 68-69, 87-88).

There are treatment notes from Masada Homes from December 2022 through September 2023. (AR 459-81). Plaintiff had self-referred for difficulty concentrating, being easily distracted, and having insomnia, depression, and arthritis. (AR 459). According to a therapist, Plaintiff initially met the criteria for persistent depressive disorder with anxious distress (late onset), with persistent major depressive episode (severe). (AR 464). The available portion of her mental status examination at intake noted disheveled appearance, concentration impaired by rumination, excessive guilt and worry, and suspicion, but otherwise findings within normal limits. (AR 462-63).[5]

---

[5]The even pages from Plaintiff's intake assessment are missing from the record. See AR 459-64 (only odd pages). Plaintiff's counsel has not raised any issue with the completeness of the record the ALJ reviewed. The remaining pages of the Masada House records are out of order. (AR 465-77).

The next note is an assessment and plan from Dr. Randell in February 2023. (AR 467-69).  Plaintiff reportedly had been seen for a psychiatric evaluation two weeks earlier and had been prescribed Cymbalta and Trazodone.  (AR 468).[6] Plaintiff reported having pain 24 hours a day, planning to start water aerobics soon, and she believed her medication was helping in that she was not hurting physically as much as she normally had.  (AR 468).  She reported feeling "blissful" at the time.  (AR 467).  Her mental status examination showed euthymic mood but otherwise findings within normal limits.  (AR 467).  Dr. Randell assessed dysthymic disorder.  (AR 467).

Dr. Randell did follow-up assessments every two months.  In April 2023, Dr. Randell noted that Plaintiff's therapist reported she was doing "ok," she had poor concentration and task completion and felt unmotivated, but in starting her antidepressant her mood and chronic pain had improved "a little."  (AR 470-71). Plaintiff recently had been denied disability again and was working with a lawyer to reapply.  (AR 471).  Plaintiff reported to her therapist that she had been encouraged to exercise and had taken her dog for a walk one time the prior week and was working to access a water aerobics class.  (AR 471).  Plaintiff was "doing well" on her antidepressant and rarely took Trazodone for sleep.  (AR 471).  Dr. Randell encouraged Plaintiff to taper down her pain medication which could improve her alertness and task completion throughout the day.  (AR 471).  Her mental status examination reported euthymic mood, moderate insight, judgment, and concentration, and otherwise findings within normal limits.  (AR 470).

In June 2023, Dr. Randell noted that Plaintiff's therapist reported that Plaintiff had been about the same – she continued to have poor motivation and was trying to have others help her, and the therapist planned to do trauma work with Plaintiff in the near future.  (AR 474).  Plaintiff stated that she recently had

---

[6]There are no treatment notes in the record for that evaluation or a later mentioned psychiatry evaluation.  See AR 474 (mentioning a psychiatric appointment in May 2023).

been more active, was sleeping well, had started walking the dog and doing gardening, was doing more activities around the house, and had bought roller skates and skated with her son.  (AR 474).  She denied a depressed mood and believed Cymbalta was helping with her pain, sleep, and mood.  (AR 474).  Her mental status examination was unchanged from the prior visit.  (AR 473).

In September 2023, Dr. Randell noted that Plaintiff's therapist reported that Plaintiff was "pretty stable," was not open to trauma therapy but had potential for transfer of services to a lower level of care in the coming months.  (AR 477).  Plaintiff reported she would be having a court appearance for her disability claim in November, and talked about her chronic pain and depression and the difficulties associated with her not working or contributing financially.  (AR 477).  Her mental status examination was unchanged from the prior visits.  (AR 476).

Dr. Randell provided a letter dated October 10, 2023, stating as follows:

Lindsey [F.] is a current patient at Masada Homes and has been receiving services here since 12/07/2022 for. . . persistent depressive disorder.  As part of her mental disorder she has regular mood swings, irritability, anxiety, disrupted sleep, poor concentration, isolative behaviors, and difficulty with interpersonal relationships.  Her symptoms interfere with her ability to function and she has difficulty completing simple tasks secondary to her mood.  She is evaluated at regular intervals and receives weekly individual therapy, individual case management and monthly medication management services as part of her treatment.  She is currently taking Cymbalta 30 mg PO BID and trazodone 50 mg PO QHS prn poor sleep.  She notes no side effects from her medications.  She continues to also deal with multiple medical comorbidities per patient including neuropathy, anemia, degenerative disc disease, chronic lower back pain,

osteoarthritis, sciatica.  Please contact our clinic with any questions you may have.

(AR 524 (emphasis added)).

There are also mental health treatment notes for three psychotherapy sessions from Mindpath Health in April 2024.  (AR 539-56).  At her first appointment, Plaintiff reported that she was taking Cymbalta prescribed by Dr. Randell.  (AR 552).  She had self-reduced her Gabapentin dose.  (AR 553).  On mental status examination, she had depressed mood, flat affect, reexperiencing perception, preoccupations/ruminations, impaired attention/concentration/memory, partial insight, and mildly impaired judgment.  (AR 553).  Her therapist diagnosed major depressive disorder (recurrent, moderate), chronic pain due to trauma, and anxiety.  (AR 555).  Plaintiff was recommended to take additional doses of Gabapentin and Cymbalta.  (AR 553).  At her next appointment, she reported she liked the increased Cymbalta dose and had started taking Trazodone again.  (AR 547).  On mental status examination, she was unkempt, anxious, had circumstantial thought processes, reexperiencing perception, preoccupations/ ruminations, and impaired attention/concentration/memory.  (AR 547-48).  She was prescribed Vistaril.  (AR 547).  At her last appointment, she reported having several anxiety attacks and her therapist recommended she increase her Gabapentin and Vistaril as needed for anxiety.  (AR 540).  Her mental status examination was the same as at her prior visit. (AR 541).

## 2.    The ALJ's Decision

In determining that Plaintiff had a RFC for a range of light work limited in part to following simple instructions and completing simple tasks in a routine work environment involving only occasional simple decision making and occasional changes in a work setting, the ALJ considered and found Dr. Randell's opinion "not persuasive."  (AR 23, 28).  The ALJ reasoned,

11

Dr. Randell did not provide a degree to which the claimant would be limited in performing simple tasks. She also did not provide any positive objective findings to support her opinion and instead listed the claimant's subjective complaints. I have generously considered the claimant's mental health treatment records, which show some abnormal findings, and find the claimant's treatment records are consistent with the determination that the claimant can complete simple tasks, work in a routine environment, and perform low stress work, which involves only simple decision making and occasional changes.

(AR 28). Earlier in the ALJ's decision, the ALJ summarized the mental health treatment records, detailing the various mental status examination findings showing some findings outside of normal limits at times, but also showing cooperative behavior, appropriate or average eye contact, normal speech, calm motor activity, intact or mildly impaired judgment, adequate or moderate insight, normal or circumstantial thought content. (AR 26-27 (citing AR 463, 467-70, 473, 476, 540-41, 547-48, 553)).

The ALJ found Dr. Sherrill's opinion "partially persuasive," as consistent with the objective findings from Dr. Sherrill's examination. (AR 28). The ALJ found the record as a whole supported a further limitation to simple tasks and low stress work due to Plaintiff's depressive symptoms caused by pain. (AR 28). The ALJ found "not persuasive" the state agency physicians' opinions that Plaintiff's mental impairments were "non severe." (AR 28).

### 3.    Analysis

The ALJ followed the new regulations in considering Dr. Randell's purported opinion (and the other opinions of record), and substantial evidence supports the ALJ's findings. As the ALJ noted, Dr. Randell did not indicate the degree of difficulty Plaintiff would have in completing simple tasks. (AR 524).

12

Arguably, the ALJ need not have given further consideration to Dr. Randell's statement since under the new regulations, a "medical opinion" is a statement about what a claimant can still do despite impairments, and Dr. Randell did not so indicate. See 20 C.F.R. §§ 404.1513(a)(2)-(3), 404.1545(a)(3); see also 20 C.F.R. § 404.1520c(c); compare Ford v. Saul, 950 F.3d 1141, 1156 (9th Cir. 2020) (finding (1) ALJ reasonably concluded that doctor's characterizations of claimant's abilities as "limited" or "fair" were inadequate for determining RFC because they did not specify functional limitations; and (2) ALJ need not have contacted the doctor to further develop the record because the ALJ had claimant's mental health records and multiple opinions from other doctors to inform the ALJ's decision).

In any event, the ALJ correctly pointed out that Dr. Randell's letter does not report any objective findings (versus Plaintiff's subjective symptoms, which the ALJ appropriately discounted as explained below) to support the conclusion that Plaintiff would have difficulty completing simple tasks. The available medical records from Dr. Randell (which the ALJ reviewed and summarized, see AR 26-27) contained some mental status examination findings outside of normal limits (AR 463, 467, 470, 473, 476, 540-41, 547-48, 553), but there is little support from these handful of snapshots of how Plaintiff was functioning at her appointments to suggest that Plaintiff would have difficulty with simple tasks, let alone be unable to perform simple work. See Wranich v. Kijakazi, 2022 WL 16960900, at *5 (D. Alaska Nov. 16, 2022) ("[M]ental status exams are a mere snapshot of a claimant's functioning on a particular day. . . .") (cleaned up). As noted above, the records from Dr. Randell do not include Plaintiff's psychiatric evaluations which may have had more objective findings. See supra note 6 & accompanying text.

In contrast, the intelligence and memory tests Dr. Sherrill administered arguably are consistent with and support her conclusion that Plaintiff could perform at least simple and repetitive tasks. (AR 435-37). As detailed above,

Plaintiff was able to understand test instructions and interview questions without difficulty, and had average full scale IQ and memory testing scores.  (AR 435-36).

The other available medical opinions from Dr. Sherrill and the state agency physicians, which suggested fewer mental restrictions than the ALJ assessed for Plaintiff (see AR 68-69, 87-88,  436-37), furnish substantial evidence to support the ALJ's RFC assessment.  See 20 C.F.R. § 404.1545(a)(3) (in determining a claimant's RFC, the Administration will consider medical source statements about what a claimant can still do, whether or not based on formal medical examinations).

The Court will uphold the ALJ's RFC assessment, and the ALJ's related findings regarding the medical opinion evidence, including Dr. Randell's opinion, as supported by substantial evidence and free from material legal error.  Woods v. Kijakazi, 32 F.4th at 792.  To the extent the record evidence is conflicting, the ALJ properly resolved the conflicts.  See Treichler v. Comm'r, 775 F.3d at 1098 (court "leaves it to the ALJ" to resolve conflicts and ambiguities in the record). The Court must uphold the administrative decision when the evidence "is susceptible to more than one rational interpretation."  Andrews v. Shalala, 53 F.3d 1035, 1039-40 (9th Cir. 1995).  The Court will uphold the ALJ's rational interpretation of the conflicting evidence in this case.

According to the vocational expert, a person with the RFC the ALJ found to exist would be capable of performing jobs existing in significant numbers in the national economy.  See AR 56-58.  The ALJ properly relied on the vocational expert's opinion in finding Plaintiff not disabled.  See Barker v. Sec'y of Health and Human Servs., 882 F.2d 1474, 1478-80 (9th Cir. 1989); Martinez v. Heckler, 807 F.2d 771, 774-75 (9th Cir. 1986).

For all the foregoing reasons, Plaintiff is not entitled to a remand based on the ALJ's consideration of the medical record and resultant RFC determination. Substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled.

14

**B.     The ALJ Gave Legally Sufficient Reasons for Discounting Plaintiff's Subjective Statements and Testimony**

Plaintiff asserts that the ALJ's reasoning for discounting Plaintiff's testimony and statements suggesting greater limitations than the ALJ found to exist is not sufficiently specific or otherwise is legally insufficient.  (Plaintiff's Brief at 4-16; Plaintiff's Reply at 2-4).

**1.     Pertinent Law**

When determining disability, an ALJ is required to consider a claimant's impairment-related pain and other subjective symptoms at each step of the sequential evaluation process.  20 C.F.R. § 404.1529(a), (d).  Accordingly, when a claimant presents "objective medical evidence of an underlying impairment which might reasonably produce the pain or other symptoms [the claimant] alleged," the ALJ is required to determine the extent to which the claimant's statements regarding the intensity, persistence, and limiting effects of her subjective symptoms ("subjective statements" or "subjective complaints") are consistent with the record evidence as a whole and, consequently, whether any of the individual's symptom-related functional limitations and restrictions are likely to reduce the claimant's capacity to perform work-related activities.  20 C.F.R. § 404.1529(a), (c)(4); SSR 16-3p, 2017 WL 5180304, at *4-*10.[7]

When an individual's subjective statements are inconsistent with other evidence in the record, an ALJ may give less weight to such statements and, in turn, find that the individual's symptoms are less likely to reduce the claimant's

---

[7]Social Security Rulings "do not carry the 'force of law,' but they are binding on ALJs nonetheless."  Bray v. Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1224 (9th Cir. 2009).  Social Security Ruling 16-3p superseded SSR 96-7p and, in part, eliminated use of the term "credibility" from SSA "sub-regulatory policy[ ]" in order to "clarify that subjective symptom evaluation is not an examination of an individual's [overall character or truthfulness]. . . [and] more closely follow [SSA] regulatory language regarding symptom evaluation."  See SSR 16-3p, 2017 WL 5180304, at *1-*2, *10-*11.

capacity to perform work-related activities.  See SSR 16-3p, 2017 WL 5180304, at *8.  In such cases, when there is no affirmative finding of malingering, an ALJ may "reject" or give less weight to the individual's subjective statements "only by providing specific, clear, and convincing reasons for doing so."  Ferguson v. O'Malley, 95 F.4th 1194, 1199 (9th Cir. 2024) (quoting Garrison, 759 F.3d at 1014-15).  This requirement is very difficult to satisfy.  See id. ("The clear and convincing standard is the most demanding required in Social Security cases." (quoting Garrison, 759 F.3d at 1015)).

An ALJ's decision "must contain specific reasons" supported by substantial evidence in the record for giving less weight to a claimant's statements.  SSR 16-3p, 2017 WL 5180304, at *10.  Generalized, conclusory findings do not suffice.  See Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (the ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony") (internal citations and quotations omitted).  An ALJ must clearly identify each subjective statement being rejected and the particular evidence in the record which purportedly undermines the statement.  Treichler, 775 F.3d at 1103 (citation omitted).  Ultimately, the 'clear and convincing' standard requires an ALJ to show his [or her] work. . . ."  Smartt v. Kijakazi, 53 F.4th 489, 499 (9th Cir. 2022).

If an ALJ's evaluation of a claimant's statements is reasonable and is supported by substantial evidence, it is not the court's role to second-guess it.  See Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).  However, when an ALJ fails properly to discuss a claimant's subjective complaints, the error may not be considered harmless "unless [the Court] can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  Stout, 454 F.3d at 1056;

see also Brown-Hunter, 806 F.3d at 492 (ALJ's erroneous failure to specify reasons for rejecting claimant testimony "will usually not be harmless").

## 2.   Summary of Plaintiff's Testimony and Statements in the Context of the Medical Record

Plaintiff testified mostly about physical limitations related to pain. (AR 44-55). There are monthly treatment notes from March 2021 through February 2024, for cervical, thoracic, and lumbar spine and multiple joint pain (i.e., hip, wrist, ankle, foot, low back, neck, and shoulder pain), intermittent right cheek numbness, and tendinosis. (AR 381-431, 482-523, 525-37).[8] Plaintiff's pain level initially ranged up to 10/10, but improved with Oxycodone. (AR 428). Her doctor prescribed Oxycodone-Acetaminophen (Percocet) and Gabapentin, physical therapy, and chiropractic care, with some noted improvement from physical therapy. (AR 382, 384, 386, 391, 394, 397, 399, 402-03, 405, 408, 411, 414, 416-17, 419-20, 423, 426, 429, 482, 485, 489, 491, 494, 497, 501, 503, 505, 507, 511, 514, 517, 519, 522, 526, 529, 531, 533, 536). Throughout her treatment, Plaintiff had tenderness on examination, positive Spurling's test, and knee and shoulder crepitus. (AR 407-08, 410-11, 413-14, 420, 423, 425-26, 428-29, 510, 513, 516,

---

[8]Prior imaging showed a number of potential sources for Plaintiff's pain. A March 2018 left knee MRI showed complete lateral patellar cartilage loss with edema, mild lateral patellar shift, small knee effusion, PT-LFC impingement and friction syndrome, and a capsular retraction injury. (AR 363). A right knee MRI also showed complete lateral patellar cartilage loss with effusion, edema, PT-LFC friction syndrome, and mild tendinosis. (AR 364). A lumbar spine MRI showed disc dessication with loss of disc height at L4-L5 and L5-S1, lower spine hyperlodotic curvature, disc protrustion at L3-L4, disc herniation with facet joint hypertrophy, ligamentum flavum hypertrophy, and stenosis at L4-L5, and disc herniation with annular tear and mild facet joint arthropathy at L5-S1. (AR 365-66). An April 2018 cervical spine MRI showed discogenic disease and facet arthropathy, moderate to severe neural foraminal narrowing at C6-C7, moderate neural foraminal narrowing at C5-C6, and mild stenosis at C5-C6 and C6-C7 with mild cord indentation and lateral recess narrowing without cord signal abnormality. (AR 367-68). In February 2019, a neurologist diagnosed mild to moderate bilateral carpal tunnel syndrome and polyneuropathy of the bilateral lower extremities, with a note that L4 radiculopathy was not definitively excluded, based on NCV/EMG studies. (AR 447-58).

17

521, 525, 528, 530, 532, 535).[9]  Of note, in December 2021, Plaintiff reportedly had been compliant with her medication and was "doing well."  (AR  402).  In March 2022, her doctor noted that an EMG showed L5 radiculopathy, and that Plaintiff would be a great candidate for an L5-S1 epidural injection.  (AR 394; see also AR 369-79 (EMG/NCV studies)).  Later in March, Plaintiff again reportedly was "doing well," and was using less Gabapentin.  (AR 391).  In May 2022, Plaintiff reportedly was "doing great."  (AR 386).  Later in May, Plaintiff reported having worsening cervical spine pain for which she wanted physical therapy.  (AR 384).  Her doctor ordered a cervical MRI and physical therapy.  (AR 384).  At this visit and at almost all of her subsequent visits, Plaintiff's doctor noted that Plaintiff's medications reduced her pain by 50 percent and allowed Plaintiff to continue doing her activities of daily living.  (AR 384, 482, 485, 488, 491, 494, 497, 500, 503, 505, 507, 510, 513, 516, 519, 521, 535).  In June and July 2022, Plaintiff asked for a L5-S1 epidural steroid injection.  (AR 381-82, 521-22).[10]

Turning to Plaintiff's testimony and statements, Plaintiff testified that she could not work because her carpal tunnel syndrome makes it hard for her to pick up things and type, and causes her to drop things.  (AR 44, 48).  Her degenerative disc disease makes it hard for her to bend, walk, and do "pretty much everything."  (AR 44).  Her arthritis makes her stiff and sometimes it is hard for her to get out of bed to walk.  (AR 44).  Her neuropathy makes her limbs have a burning, tingling sensation that "gets worse as the days go by."  (AR 44).  She could squat to pick up items she drops, but said that she gets pain when she does.  (AR 50).  She has

---

[9]Some of these results may have been duplicated from prior visits since Plaintiff had several evaluations by video conference due to the Covid-19 pandemic.  See, e.g., 404-18 (video evaluations).

[10]There are no records from the injection.  Plaintiff testified that she had the injection and it only helped for a "couple hours."  (AR 45).

18

trouble reaching due to shoulder pain. (AR 51). Her pain had gotten worse since she stopped working – she has severe pain all day, every day. (AR 54).

Plaintiff admitted that Gabapentin takes away her tingling. (AR 46). She also admitted that her pain medication "helps a little bit." (AR 46). Plaintiff had not had injections for her carpal tunnel syndrome. (AR 44). She wore braces that she ordered from Amazon and had not had anything prescribed. (AR 44). She had not had any consultations to see if surgery could be an option for her carpal tunnel syndrome. (AR 44-45).

Plaintiff also said depression impacts her ability to work in that it is hard for her to speak to others, she lacks motivation to do things, gets frustrated, has trouble focusing and staying on task. (AR 53). Her depression never goes away and it sometimes interferes with home schooling her son in that she cannot concentrate or think "straight" to help him. (AR 53-54).

Plaintiff estimated she could lift less than 10 pounds. (AR 51). She said she could sit at a computer to work for up to five minutes before she would need to get up and walk around. (AR 52). Plaintiff earlier had said on a typical day she is "mostly sitting on [her] butt." (AR 46). She tries to do "a couple of things" for her aunt like making hot cereal for breakfast and a little cleaning, and she takes a lot of breaks. (AR 47). One task could take her all day. (AR 47). She said she cooks "maybe once a week," and does it with help because she cannot stand for longer than three minutes and her hands cramp. (AR 47-49). Her cooking took up to three minutes. (AR 48). She could drive but "not a lot." (AR 47). She helped her 11-year-old son with home schooling, but said he is very intelligent and does the work himself. (AR 47). She could run errands like grocery shopping "sometimes," and usually takes one of her kids to help. (AR 47-48).

Plaintiff was working as a care giver providing in home health care for her aunt about 73 hours a month since May 2020. (AR 41-42; compare AR 245 (Plaintiff reporting that she had worked as a care giver for four hours a day, three

19

days a week)).  She did light cleaning, cooking, laundry, light dusting, light vacuuming, made a twin-sized bed, and she cleaned her aunt's stoma.  (AR 41-42, 276).  She lifted 10 pounds and could lift and carry a small laundry basket about 30 feet and take out the trash about 30 feet.  (AR 276).

In a June 2022 Function Report form, Plaintiff reported that she could not stand, walk or sit for long, and could not lift more than 15 pounds.  (AR 281).  She spent her days getting her kids up and driving them around the block for school, doing short 10-15 minute tasks with about a 30-minute break, picking up her kids from school, preparing dinner with help (depending on the meal), taking another break for 30 minutes to an hour, cleaning the kitchen with help, taking a break, then helping her kids with homework.  (AR 282).  The tasks she did for her aunt were 15 minutes.  (AR 282).  The meals she cooked were simple because she cannot stand for long – if she cooked something that takes long, she had help and took sitting breaks.  (AR 283).  She could do most household chores but needed help and chose at least one chore a day which usually took all day because she has to take breaks.  (AR 283).  She did most of her shopping online, but she could to a store with help to lift heavy items once a week.  (AR 284-85).   She sometimes needed help dressing and caring for her hair.  (AR 282).  She read, watched television, and played games on her cell phone daily.  (AR 285).  She did not attend social functions because she could not walk far.  (AR 285).   She reported that pain affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, stair-climb, complete tasks, concentrate, and use her hands.  (AR 286).  She estimated that she could walk for 15 minutes before needing a 20-minute break.  (AR 286).  She had no problems paying attention, finishing what she starts "eventually," and indicated that she follows written and spoken instructions "well," gets along with authority figures "well," and handles stress or changes in a routine "fine."  (AR

286-87).[11]  In a later Function Report, Plaintiff reported that she could not write or type for long periods of time, often drops things, and cooked one meal a week which usually took an hour.  (AR 314, 316).

### 3.    The ALJ's Decision

The ALJ summarized Plaintiff's testimony and statements and found that while her medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements concerning the intensity, persistence, and limiting effects of those symptoms were not consistent with the medical evidence and other evidence in the record.  (AR 22-24).  Specifically, the ALJ reasoned that:   (1) the record as a whole was inconsistent with Plaintiff's allegations and claimed limitations (i.e., Plaintiff consistently reported during physical appointments that she experienced no medication side effects and that her medication reduced her pain level by 50 percent, allowing her to perform activities of daily living); (2) Plaintiff's carpal tunnel treatment was conservative (i.e., she had not undergone any injections or surgery consultations for her carpal tunnel syndrome, and had on her own purchased wrist braces); (3) Plaintiff's admitted daily activities were inconsistent with her alleged limitations (i.e., she worked caring for her aunt for 73 hours a month, doing light cooking and cleaning her aunt's stoma, she assisted her son's home schooling, she told Dr. Sherrill that she performed household chores, could run errands and shop alone, could prepare meals without help, and went for short walks).  (AR 23-24).

### 4.    Analysis

The ALJ's reasoning for discounting Plaintiff's statements and testimony suggesting greater limitations than the ALJ found to exist is sufficiently specific and supported by substantial evidence.

---

[11]Plaintiff's husband provided Function Report forms reporting similar limitations and abilities, noting that Plaintiff's cooking took 15 minutes or less and her weekly shopping took one hour.  (AR 289-96, 306-13).

### a. Inconsistencies with the Medical Record

The ALJ permissibly could rely on the inconsistencies between Plaintiff's testimony and the medical record and the nature of Plaintiff's treatment to reject Plaintiff's testimony and statements. As the ALJ noted, although Plaintiff testified that her pain significantly limited her functioning, she has severe pain all day, every day, and her medication "helps a little bit," her treatment records consistently note that her medication reduced her pain by 50 percent and allowed her to perform activities of daily living. (AR 23; see also AR 384, 485, 482, 488, 491, 494, 497, 500, 503, 505, 507, 510, 513, 516, 519, 521, 535). At times, she reported she was "doing well" or "doing great." (AR 386, 391, 402).

"Contradiction with the medical record is a sufficient basis for rejecting the claimant's subjective testimony." Carmickle v. Commissioner, 533 F.3d 1155, 1161 (9th Cir. 2008); see also Smartt, 53 F.4th at 498 ("When objective medical evidence in the record is inconsistent with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony.") (emphasis original). Additionally, evidence suggesting a claimant's symptoms are managed or improve with treatment is a clear and convincing reason for rejecting disabling symptomatology. See Lapuzz v. Berryhill, 740 Fed. App'x 596, 597 (9th Cir. 2018) ("effectiveness of medication is a clear and convincing reason to discredit claimant testimony") (citing Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008)); Wellington v. Berryhill, 878 F.3d 867, 876 (9th Cir. 2017) ("evidence of medical treatment successfully relieving symptoms can undermine a claim of disability"); Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for SSI benefits."); Brown v. Comm'r of Soc. Sec., 2021 WL 4078015, at *17 (E.D. Cal. Sept. 8, 2021) (that claimant's pain was reported to be well-managed and improved with medication is a clear and convincing reason to reject pain testimony). While Plaintiff's pain

medications may not have relieved her pain completely, the record suggests enough relief for her to perform activities of daily living which involved far greater exertion than would be suggested by Plaintiff's alleged limitations.

Here, it was reasonable for the ALJ to discount Plaintiff's asserted limitations from pain given the inconsistencies between Plaintiff's testimony and what she reported to providers about her pain relief. The Court will not second guess the ALJ's reasoning. Thomas v. Barnhart, 278 F.3d at 959.

### b.    Conservative Treatment

The ALJ also permissibly could rely on Plaintiff's conservative treatment for her carpal tunnel syndrome. See Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) ("[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment.") (citation omitted), cert. denied, 552 U.S. 1141 (2008); SSR 16-3p, 2016 WL 1119029, at *7-*8 (ALJ may give less weight to subjective statements where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints. . . ."). As the ALJ noted, Plaintiff alleged to be quite limited by her carpal tunnel syndrome, yet she admitted she had not sought treatment beyond ordering over-the-counter wrist braces. (AR 23-24; see also AR 44-45). It was reasonable for the ALJ to discount Plaintiff's asserted limitations from carpal tunnel syndrome given Plaintiff's lack of treatment. The Court will not second guess the ALJ's reasoning. Thomas v. Barnhart, 278 F.3d at 959.

### c.    Plaintiff's Daily Activities

The ALJ also permissibly could rely on Plaintiff's inconsistent daily activities to discount her testimony and statements. See, e.g., Smartt, 53 F.4th at 499 (claimant's "daily activities may be grounds for discrediting a claimant's testimony to the extent that they contradict claims of a totally debilitating impairment"; ALJ properly cited daily activities which included performing chores, "albeit in short increments due to pain," cooking, cleaning, and caring for

the claimant's daughter) (citation and quotation marks omitted); Trevizo, 871 F.3d at 682 ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination.") (citing Ghanim v. Colvin, 763 F.3d 1154, 1165 (9th Cir. 2014)); Molina, 674 F.3d at 1113 ("Even where [a claimant's] activities suggest some difficulty functioning, they may be grounds for [giving less weight to] the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.") (citations omitted); Valentine v. Comm'r, 574 F.3d 685, 693 (9th Cir. 2009) (claimant's admitted activities did not suggest that claimant could work, but did suggest that claimant was exaggerating the severity of claimant's limitations); SSR 16-3p, 2016 WL 1119029, at *7 (ALJ may determine that claimant's symptoms "are less likely to reduce his or her capacities to perform work-related activities" where claimant's subjective complaints are inconsistent with evidence of claimant's daily activities) (citing 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3)).

The daily activities the ALJ cited in this case arguably contradict Plaintiff's assertion that she could not work due to pain limiting her ability to sit for more than five minutes, stand for more than three minutes, and walk for long periods, and due to upper extremity limitations and depression. As the ALJ noted, Plaintiff was able to work 73 hours a month caring for her aunt by doing light housework and cleaning her stoma, and could assist her son with his home schooling. (AR 22-24; see also AR 41-42, 47). Plaintiff admitted to Dr. Sherrill that she performed household chores, ran errands, shopped alone, prepared meals without help, and went for short walks. (AR 24; see also AR 434). The Court also notes that Plaintiff reported to her therapist that she had been encouraged to exercise and she was working to access a water aerobics class. (AR 471). Plaintiff reported to Dr. Randell in June 2023, that she recently had been more active, was sleeping well, had started walking the dog, gardening, was doing more activities around the house, and had bought roller skates and skated with her son. (AR 474).

24

On this record, the ALJ's reliance on Plaintiff's daily activities was reasonable.  The Court will not second guess the ALJ's reasoning.  Thomas v. Barnhart, 278 F.3d at 959.

### 5.   Conclusion

The ALJ stated independently valid reasons supported by substantial evidence for discounting Plaintiff's testimony and statements suggesting greater limitations than the ALJ found to exist.  The ALJ's stated reasons are sufficiently specific for the Court to conclude that the ALJ discounted Plaintiff's testimony and statements on permissible grounds.  Moisa v. Barnhart, 367 F.3d at 885.  The Court therefore defers to the ALJ's determination.  See Lasich v. Astrue, 252 Fed. App'x 823, 825 (9th Cir. 2007) (court will defer to Administration's credibility determination when the proper process is used and proper reasons for the decision are provided); accord Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1464 (9th Cir. 1995).

Plaintiff is not entitled to a remand based on the ALJ's consideration of her testimony and statements.

## V.   CONCLUSION

For the foregoing reasons, the decision of the Commissioner of Social Security is AFFIRMED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: January 20, 2026

_____/s/_____
Honorable Jacqueline Chooljian
UNITED STATES MAGISTRATE JUDGE

25